# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**KAREN CONNORS,**

        **Plaintiff,**

                                       **Case No. 2:12-cv-073**
                                       **JUDGE SMITH**
     **v.**                                      **Magistrate Judge Kemp**

**LIFE INSURANCE COMPANY
OF NORTH AMERICA,**

        **Defendant.**

## OPINION AND ORDER

Plaintiff Karen Connors brings this action pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. § 1132.  On October 30, 2012, both parties moved for judgment on the administrative record (Docs. 14 and 15).  Responses have been filed and these motions are now ripe for review.  For the reasons that follow, the Court **GRANTS** Plaintiff's Motion for Judgment on the Administrative Record and **DENIES** Defendant's Motion for Judgment on the Administrative Record.

## I.  BACKGROUND

Plaintiff Karen Connors was employed as President and Chief Executive Officer of Grant Medical Center in Columbus, Ohio since May 2006.  She was a participant in the long-term disability plan ("the Plan") offered by her employer, OhioHealth Corporation.  The Plan provides benefits through a policy and contract of insurance issued by Life Insurance Company of North America ("LINA").  (AR 1014-1056).  Under the terms of the Plan, Plaintiff is a "Class 5 participant" and LINA will pay disability benefits "if an Employee becomes Disabled while

covered under this Policy.  The Employee must satisfy the Elimination Period, be under the Appropriate Care of a Physician, and meet all the other terms and conditions of the Policy.  He or she must provide the Insurance Company, at his or her own expense, satisfactory proof of Disability before benefits will be paid."  (AR 1038).  The Elimination Period "is the period of time an Employee must be continuously Disabled before Disability Benefits are payable."  (AR 1038).  According to the Schedule of Benefits for a Class 5 participant, Plaintiff's Elimination Period was 120 days.  (AR 1029).  Under the Plan, the definition of "Disability/Disabled" is:

> The Employee is considered Disabled if, solely because of Injury or Sickness, he or she is:
>
> 1.  unable to perform the material duties of his or her Regular Occupation; and
> 2.  unable to earn 80% or more of his or her Indexed Earnings from working in his or her Regular Occupation.
>
> After Disability Benefits have been payable for 48 months, the Employee is considered Disabled if, solely due to Injury or Sickness, he or she is:
>
> 1.  unable to perform the material duties of any occupation for which he or she is, or may reasonably become, qualified based on education, training or experience; and
> 2.  unable to earn 60% or more of his or her Indexed Earnings.

(AR 1029).

"Regular Occupation" is defined as the occupation the employee was performing at the time she became disabled.  (AR 1050).  LINA has identified Plaintiff's "Regular Occupation" to be the president of a health care facility.  (AR 5).  According to LINA, Plaintiff's occupation required "Light demand activities."  (AR 94).

**A.    Plaintiff's Medical Condition**

In September 2009, Plaintiff Connors was diagnosed as suffering from a "[r]ight

vestibular schwannoma," (AR 578), a tumor that was thought to be benign but, "because of its size and proximity to the brainstem," it needed to be removed.  (AR 232, Connors Aff. ¶7).  On November 19, 2009, Connors underwent surgery at Johns Hopkins Medical Center for removal of the tumor.  (AR 578).  She was discharged on November 24, 2009.  (AR 623).

In the ensuing several months, Connors "experienced significant dizziness, nausea, imbalance, sensitivity to visual stimuli and noise, inability to do complex thinking, right-sided facial paralysis, double vision, difficulty communicating thoughts, difficulty adjusting to complete right-sided hearing loss and extreme fatigue."  (AR 232, Connors Aff. ¶9).  Plaintiff noted these complaints during visits with her physical therapist and doctors following surgery.  During a physical therapy appointment on December 21, 2009, Plaintiff demonstrated increased dizziness with activity.  (AR 404).  A week later she reported that she had returned to work part-time but with increasing sickness, nausea, and fatigue and noticeable imbalance.  (AR 403).  Dr. Tamargo at Johns Hopkins saw Connors on January 11, 2010 and noted in her file that Connors "ambulates slowly and tends to touch the wall as she turns corners on the right side."  He wrote that he expected her to notice progress "from month to month as opposed to week to week," and he "asked her to resume her social and professional activities without restrictions."  (AR 425). Dr. Gokhale, also at Johns Hopkins, reported that Connors was working part-time, expected to return full-time, and was "doing well."  (AR 480).

In a later notation, Dr. Tamargo expanded on Connors's medical condition in January 2010. "I last saw the patient on 1/11/10.  At that time, she stated that she was pleased with her progress but reported persistent dizziness, balance problems, and slight diplopia."  (AR 422).

Connors tried on more than one occasion to return to work, but her efforts ultimately

were unsuccessful.  (AR 233; Connors Aff. ¶¶13-15).  Dr. Santanello, a co-worker of Connors, reported that Connors's dizziness, double vision and nausea made it "very nearly impossible for her to concentrate on a particular topic for any length of time." (AR 222; Santanello Aff. ¶7). "She could not tolerate 'room noise' or multiple simultaneous conversations as these often exacerbated her symptoms.  Although I felt she retained her ability for complex thinking and problem solving, many of the above factors prevented her from performing at her previous level."  (AR 222; Santanello Aff. ¶8).

Heather Brandon, who was Grant's Director of Hospital Support (Finance) reported that, when Connors attempted to return to work, "[s]he had to hold onto walls and sit frequently throughout the day.  She was able to drive a bit but if she stayed at work more than 4 hours she was too overwhelmed to drive at times. … [C]oncentrating in traffic made it difficult for her to focus on directions."  (AR 216; Brandon Aff. ¶8).  Brandon noted that Connors "was unable to run meetings because if she tried to focus on more than two or three people she would get blurred vision, headaches, nausea, etc. and could not be effective in the meetings let alone try to drive afterwards.  She could not do her leadership duties that included speaking at various events because of the light in her eyes and the inability to leave the podium without falling."  (AR 216-17; Brandon Aff. ¶9).

Vickie Graymire, a registered nurse and Grant's Trauma Program Manager (AR 223; Graymire Aff. ¶1), reported "[o]n those occasions when she tried to return to work, she could only tolerate a limited number of hours.  She could meet with staff individually, but not in groups.  She continued with balance difficulties and double vision.  At the end of even these short days, she was exhausted." (AR 224; Graymire Aff. ¶10).  Ms. Graymire continued:

> It has now been almost 2 years since her surgery. She has tried physical therapy, visits back to her original surgeons, medications and multiple ways to cope with the difference in her life. She continues to struggle with her ability to manage simple distractions and stimulations that we think are normal. The sounds of life such as a car radio, along with heavy traffic, honking horns and signs flashing by are beyond her ability to manage for any longer than short trips.

(AR 225; Graymire Aff. ¶¶12-14).

Connors's supervisors initially directed her to take a 90-day sabbatical, but ultimately concluded that she was unable to perform the essential functions of her job and terminated her employment.  (AR 233, 236-41; Connors Aff. ¶¶14-15).

Connors continued to struggle with her health.  A "Balance and Vestibular Evaluation" conducted on October 29, 2010 noted "vestibular hypofunction [with] otilith linear acceleration difficulties, [right] eye instability [with] double vision [and] saccadic eye movement."  (AR 372).

A physical therapy notation from January 3, 2011, indicated increasing symptoms, particularly with auditory stimulation.  (AR 369).  On January 18, 2011, Dr. Burns, an ophthalmologist, conducted a medical evaluation, noting that Connors reported "double vision, extreme fatigue when in busy new environments and the inability to tolerate airports or busy stores due to all of the visual chaos."  (AR 343).  Dr. Burns also reported that Connors found that "looking down at the floor was the only way to function.  Sitting in meetings and processing information from distance to near is no longer possible.  Dizziness and nausea often occurs in new environments. Driving on unfamiliar highways is still a challenge and [not] possible."  (*Id.*).

In February 2011, Connors returned to Dr. Tamargo at Johns Hopkins.  He reported that Connors "continues to experience difficulties, but only when she is out of her house.  She states that within the environment at home, which is familiar and quiet, she does not have any

symptoms.  When she goes out, however, she becomes dizzy, nauseated, develops ataxia and also has diplopia."  (AR 422).  Also in February, 2011, Connors reported to her gynecologist, Dr. Alderman, that she was experiencing hearing problems, fatigue, tiredness, and nausea.  (AR 274).

Plaintiff again returned to Johns Hopkins in August 2011.  Dr. Yuri reported that Connors "continues to experience significant dizziness and nausea, preventing her from being able to work. . ..  She also reports noise sensitivity as well as light sensitivity. . ..  Her symptoms appear to fluctuate and the last 3-4 weeks have been exceptionally difficult."  (AR 315).  On examination, Dr. Yuri noted that "[r]apid rotary head thrust testing in the horizontal canal plane to the right reveals a positive head thrust test and refixation saccade suggestive of a right-sided unilateral vestibular weakness that is uncompensated for."  (*Id*.).  He noted that, even 20 months after surgery, she "continues to have significant difficulty carrying on her regular activities due to the persistent dizziness and nausea…."  (*Id*.).  Dr. Yuri also suggested that Connors's symptoms "may be secondary to migraine phenomenon that may have developed postoperatively" (AR 316) due to "incomplete healing of the 'lining of [Connors's] brain.'"  (AR 333).

On August 31, 2011, Connors was evaluated by ophthalmologists at The Ohio State University.  Dr. David Hirsch diagnosed Connors as suffering from optic nerve hypoplasia, convergence insufficiency, exophoria, and saccadic eye movement deficiency.  (AR 335).

**B.    Plaintiff's Application for Disability Benefits**

On January 7, 2011, Plaintiff applied to LINA for long-term disability benefits.  (AR

476).[1]  OhioHealth provided a description of Plaintiff's job duties, which included providing

effective administrative management, consulting with the Board and senior management,

directing strategic planning, and interfacing with the community and area academic institutions.

(AR 473-75).  LINA researched the physical demands of Plaintiff's position and determined that

it required "Light demand activities" as defined by the Dictionary of Occupational Titles.  (AR

94).  "Light demand level occupations generally require exerting up to 20 pounds of force

occasionally, or up to 10 pounds of force frequently, or a negligible amount of force constantly

to move objects."  (AR 94).

In support of her initial application, Plaintiff submitted the January 18, 2011 letter from

Dr. Burns (AR 399-401).  Plaintiff described her symptoms as hearing loss, imbalance,

dizziness, nausea, fatigue, sensitivity to noise and visual stimuli, and double vision as a result of

her November 19, 2009 surgery.  (AR 103, 452).  Plaintiff was notified on March 2, 2011 that

her application for long-term disability benefits was received.  (AR 144-46).  LINA sent

correspondence to Plaintiff's treating physicians, Drs. Niparko and Tamargo, requesting

complete copies of her pertinent medical files, as well as a Physical Abilities Assessment.  (AR

128-136).

Defendant primarily relies on a record from a January 11, 2010 office visit with Dr.

Niparko noting that Plaintiff was "doing well" despite some imbalance and documented her

return to work.  (AR 103, 480).  This was Plaintiff's last office visit with Dr. Niparko and there

---

[1] Plaintiff also references AR 448-451 and 452-455, however, on these records, there are
either no dates or subsequent dates to that mentioned above reflected on these documents.
Defendant notes that Plaintiff submitted an application for long-term disability benefits via
telephone on February 25, 2011. (AR 156, 436).  It was on that date that Plaintiff called to check
the status of her claim, and Defendant indicated that it did not have any record of her claim.  (*See*
AR 436).

were no future visits scheduled.  (AR 103, 458).  Additionally, Defendant relies on a January 11, 2010 record from an office visit with Dr. Tamargo who noted that Plaintiff had some dizziness and balance problems, but was running on the treadmill and had returned to work on a limited basis.  (AR 377-78).  Dr. Tamargo's notes further state:

> I reviewed the expected recovery from this point on with the patient and her daughter.  I anticipate that she will continue to improve and will notice progress from month to month, as opposed to week to week up until at this point.  I asked her to resume her social and professional activities without restrictions.  Similarly, she has no medication restrictions.  Given that she is doing so well, I asked her to set up a follow up MRI and appointment with me in 1 year.

(AR 377).

On February 2, 2011, Plaintiff returned to Dr. Tamargo complaining of difficulties, including persistent dizziness, balance problems, and slight diplopia.  (AR 355).  Dr. Tamargo performed a comprehensive neurological examination, including an MRI.  (AR 356).  He found no "specific deficits other than hearing loss that would explain her current symptoms" and noted that the MRI showed "the expected postoperative changes and no evidence of tumor residual or recurrence."  (AR 356).  He further advised that Plaintiff "pursue her social [and] professional activities without restrictions."  (AR 356).

LINA referred this matter to Mary Difatta, a Nurse Case Manager.  (AR 48, 103).  She contacted Dr. Tamargo's office and was advised that Dr. Tamargo was not restricting Plaintiff from returning to work.  (*Id.*).  LINA also requested additional information from Plaintiff's optometrist, Dr. Burns.  On April 21, 2011, Plaintiff submitted additional information to LINA regarding her consultations with Dr. Burns.  (AR 103, 397-412).  All of this information was then referred to LINA's Associate Medical Director, Dr. Paul Seiferth, for a medical review.  (AR 40, 103).  Dr. Seiferth concluded:

> It is my professional opinion with a reasonable degree of medical certainty that, the restrictions and limitations provided are supported from date of incur or surgery for exclusion of acoustic neuroma on 11/19/2009 to follow up on 1/11/2010 . . . Follow up visits with Dr. Tamargo, neurologist, dated 1/11/2010 and 2/11/2011 both indicate recommendation of resumption of all activities without restrictions or limitations.  Physical examinations are remarkable for wide based gait and are otherwise essentially normal with no motor deficits, sensory deficits, or cognitive deficits measured and documented.

(AR 38-39).

The review of Plaintiff's application by LINA's Claims Manager and Dr. Seiferth led to LINA's letter of April 28, 2011, denying her claim for benefits.  (AR 35-37, 102-04).  LINA wrote that:

> Upon review of all of the available information, it was determined that medical information only supports the restrictions and limitations of no work until your office visit on January 11, 2010, at which time Dr. Tamargo releases you to return to work full time.
> * * *
> In summary, in order for benefits to be payable, a claimant must be disabled from performing their own occupation throughout the entire benefit waiting period. Since you went out of work on November 18, 2009, according to the elimination period listed above, your benefit start would not have begun until March 18, 2010.  Upon review of all of the information available, it is determined that the medical information would preclude you from performing your own occupation only throughout January 11, 2010.  Since that date is prior to your benefit start, we are unable to approve your claim for Long Term Disability benefits.

(AR 103-104).

## C.  Plaintiff's Appeal of her Denial of Long-Term Disability Benefits

On July 29, 2011, Plaintiff, through counsel, submitted a request for an appeal of the denial of her claim, as well as a copy of the claims file.  (AR 390-391).  LINA acknowledged the receipt of Plaintiff's appeal and requested that she provide any additional information in support of her claim.  (AR 108-109).  On August 10, 2011, LINA sent Plaintiff a copy of the claims file. (AR 29).  Plaintiff's counsel requested additional time to gather information in support of her

appeal.  (AR 28).  On October 25, 2011, Plaintiff, through counsel, submitted the following

additional documents in support of her appeal:

- a letter from Dr. Niparko dated October 20, 2011, in which he wrote:

> Karen Connors is a patient in my otolaryngology practice at Johns
> Hopkins. She had a resection of a right vestibular schwannoma on
> 11/19/2009.  Due to persistent dizziness related to vestibular hypofunction
> and an atypical migraine phenomenon which developed post operatively,
> she continues to have difficulties working.
> At times, after a resection of a vestibular schwannoma, the brain lining
> continues to be irritated for some time afterwards. We have asked her to
> follow a diet to avoid triggers for migraine as well as a program of
> vestibular physical therapy.  I anticipate that these symptoms will improve
> over time but that they may take up to 3 years from the date of surgery to
> fully resolve.

(AR 220).

- an affidavit from friend and co-worker Heather Brandon, describing why
  she believes Plaintiff was unable to work;

- an affidavit from friend and co-worker Dr. Steve Santanello, Vice
  President of Trauma and Surgical Services at Grant, who described that
  Connors:

> clearly demonstrated residual deficits that affected her both physically and
> cognitively. From a physical standpoint, she developed a right-sided facial
> nerve palsy. Complete hearing loss in the right ear made conversation
> somewhat difficult especially in the presence of two or more people." (AR
> 222; Santanello Aff. ¶6). Dr. Santanello added that Connors "was very
> unbalanced on her feet, affecting her gait and her ability to stand for any
> prolonged period of time. Dizziness associated with double vision and
> nausea was a constant complaint." (AR 222; Santanello Aff. ¶7).

- an affidavit from Plaintiff's daughter, Lauren Connors, offering a personal
  perspective on Plaintiff's medical status.  She described:

> After 6 months she began to try exercising. She could not exercise as
> much as she was doing pre-surgery.  She still had a hard time even
> driving. She was seeing double, her balance was off, she would get dizzy,
> and was nauseated still.
> After 12 months she was recovering, but very slowly.  She might not have

seen improvement but I did.  I noticed a lot of changes in her. She began to drive but only around here in Columbus. She could not make long trips, no more than 40 minutes at the most or she would get tired out.

She would have good and bad days. The good days were increasing but she still experienced bad ones. The thing is she never knew when a bad day would occur. It would or still occurs at anytime. She was still getting dizzy, seeing double, still nauseated at times, and would get tired easily. Also noise would bother her as well. If it was a crowded area with lots of loud noise and a cluster of people, she would start to become dizzy, sometimes feel nauseous, and would start to become off balance and wobbly.

As time went on these bad days decreased but she still gets them from time to time. The things like dizziness, double vision, off balance, being bothered by noise always are with her. Those things seem to never go away. Therefore presently most of the same things still occur, just not as frequent.

She still cannot drive more than 40 minutes and I don't want her to, wouldn't trust it.  She is still seeing double vision and her balance is wobbly still.

(AR 227-228; L. Connors Aff. ¶¶ 5-9).

•        an affidavit from Plaintiff supporting her claim for benefits, stating:

Presently, the symptoms that are most troubling to me that have not resolved are the dizziness, nausea, imbalance, double vision, sensitivity to noise/visual stimuli and fatigue. I am unable to endure crowds, noise or activity for any length of time without getting dizzy and nauseated and "wobbly".  I manage the nausea with medication, which then makes me very sleepy.

If I am in a social setting with more than a few people, I find it very difficult to concentrate and follow the conversation. Reading is difficult for anything but a short period of time, as it takes a great deal of focus to overcome my double vision problems when reading. Driving is difficult also, due to double vision and my visual sensitivities.

While I have regained my complex thinking ability, it is quickly compromised when I experience my other symptoms all at the same time. I have visited my Hopkins surgeons as well as other medical specialists to determine what I can do to improve my health status. At my last visit with my Hopkins surgeon, Dr. John Niparko, he indicated that he believed many of the problems I was experiencing were due to the lining of my brain not healing properly post-surgery, causing migraine and migraine symptoms.  While this is not "common", it does occur in some acoustic neuroma patients.

> This is in addition to my brain's lack of adequately compensating at this point for the removal of the right vestibular nerve, which is what maintains a person's balance. While he was hopeful that all these might improve with time, he indicated it could be another 2-3 years.

(AR 233-234; Connors Aff. ¶¶16-20).

- copies of correspondence between Plaintiff and OhioHealth personnel regarding a three-month sabbatical she took from work beginning on March 2, 2010.

(AR 213-240).

On November 8, 2011, Plaintiff's attorney also submitted additional medical records from The Johns Hopkins Hospital, relating to Plaintiff's surgery.  (AR 519-990).

LINA again had a doctor review Plaintiff's claim, Dr. Richard Hall, who is Board Certified in Neurosurgery.  (AR 16-17).  On December 16, 2011, Dr. Hall reviewed the medical and vocational information in the claims file and concluded that there was "no evidence of any cognitive evaluation to address the complaints of cognitive dysfunction," and that a "status of no work is not supported."  (AR 16).

LINA then initiated an independent peer review by Dr. Alan Lipkin, Board Certified in Otolaryngology with expertise in Neurology.  (AR 11-12, 514-517).  Dr. Lipkin's report indicates that he reviewed all the information in the claims file and that he communicated with Nurse Practitioner Barbara Gottschalk from Dr. Niparko's office.  (AR 514-517).  In connection with the medical review, LINA posed questions to Dr. Lipkin, which were asked and answered as follows:

> 1. For the time period as of November 18, 2009 through March 18, 2010, if medical supports through this period please review March 18, 2010 to the present: Are the restrictions which are outlined by the following providers supported for the above stated time period(s)? Please provide clinical rationale for your response.

12

For the time period in question, the restrictions outlined are supported. In January 2012, Dr. Niparko had no issues with the claimant increasing her schedule to full time work. In February 2011, Dr. Tamargo advised her to return to professional social activities without restriction. Although she continues to have balance related symptoms and possibly migraine issues and physical therapy continues to be advised, there are no diagnosed issues that would cause me to disagree with her attending physicians. She has been seen by Dr. Burns and vision therapy has been performed for her convergence issues. I am not an eye specialist and this issue is out of my area of expertise–I have no comment on the eye issue.

\* \* \* \*

3. If you find the available information is insufficient or unclear and/or you disagree with the attending provider(s) please contact Dr. Niparko and Dr. Burns. Please be sure to document you differences of opinion and the conflicting medical information that was discussed.

I discussed the case with Barbara Gottschalk, who is Dr. Niparko's Nurse Practitioner. I do not have any differences of opinion with those voiced by Dr. Niparko in January 2010. Barbara Gottschelk, NP stated that she speaks for him on cases like this, will discuss the substance of our conversation with him, and he would contact me if there are any changes in opinion. After acoustic neuroma surgery, the claimant has a nonhearing ear and balance related symptoms, but it is Dr. Niparko's opinion and general practice to allow patients like this to return to normal office type work. This is in accordance with his opinion voiced January 2010. If the claimant has periodic episodes of more severe balance disturbance, accommodation in the workplace may be needed to allow for breaks.

(AR 514-517).

On December 20, 2011, LINA issued a letter denying Plaintiff's appeal. (AR 94-97).

LINA explained in the letter that it relied on the conclusions of Dr. Lipkin and that "the medical information available for review did not reveal a significant physical or global functional impairment to prevent your client from performing the duties of her own occupation throughout her Elimination Period." (AR 95). It also explained that it was "not stating that your client may not have some health problems as a result of her condition, rather we have not been provided with medical documentation to support an impairment of functional capacity severe enough to affect her ability to work." (AR 96). Therefore, LINA reaffirmed its prior denial of Plaintiff's

13

claim for long-term disability benefits and informed her that a second appeal request was not required, but would be accepted.  (AR 97). Plaintiff did not submit a second appeal.  Instead, Plaintiff initiated this lawsuit.

## II.    STANDARD OF REVIEW

Plaintiff's claim for benefits is governed by ERISA.  Section 502(a)(1)(B) gives Plaintiff the right, as a participant of the Plan, to bring a civil action "to recover benefits due to [her] under the terms of [her] plan, to enforce [her] rights under the terms of the plan, or to clarify [her] rights to future benefits under the terms of the plan."  29 U.S.C. § 1132 (a)(1)(B).  The Court reviews a challenge to a denial of ERISA plan benefits under a *de novo* standard "unless the plan provides to the contrary."  *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008).  Under such circumstances where the "benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," the more deferential "arbitrary and capricious" standard of review applies. *McCartha v. Nat'l City Corp.*, 419 F.3d 437, 441 (6th Cir. 2005) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)).

Although Plaintiff initially asserts that this Court's review should be de novo, both parties ultimately agree that this Court is bound by the Sixth Circuit decision in *Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 555-56 (6th Cir. 1998) (en banc).  In Perez, the Sixth Circuit found discretionary authority where the documents required a beneficiary to provide "satisfactory evidence" in support of his claim.  The LINA policy includes similar language that Plaintiff "must provide the Insurance Company, at his or her own expense, satisfactory proof of Disability before benefits will be paid."  (AR 1038).  Additionally, LINA asserts that under the Plan, it

reserves the right to "determine whether or not benefits are payable in accordance with the terms of the Policy." (AR 1053). Accordingly, the Court will apply the arbitrary and capricious standard to this case.

The arbitrary and capricious standard is the least demanding form of judicial review of administrative action. *Evans v. UnumProvident Corp.*, 434 F.3d 866, 876 (6th Cir. 2006). Under this standard, a court will uphold an administrator's decision if it is rational in light of the plan's provisions. *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 169 (6th Cir. 2003) (citation omitted). "[W]hen it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary and capricious." *Id.*; *see also Baker v. UMWA Health & Retirement Funds*, 924 F.2d 1140, 1144 (6th Cir. 1991) ("Applying the abuse of discretion standard in this context requires that the [administrator's] decision be upheld if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence."). The arbitrary and capricious standard, however, does not require a court to merely rubber stamp the administrator's decision; instead, a court "must exercise review powers." *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004).

When conducting its review of a denial of benefits claim, the Court is generally "limited to consideration of the information actually considered by the administrator." *Killian v. Healthsource Provident Adm'rs, Inc.*, 152 F.3d 514, 522 (6th Cir. 1998); *see also Marks v. Newcourt Credit Group, Inc.*, 342 F.3d 444, 457 (6th Cir. 2003). The Court is required to review the plan administrator's decision based on the administrative record and render findings of fact and conclusions of law accordingly. *Wilkins v. Baptist Healthcare Systems, Inc.*, 150 F.3d 609, 619 (6th Cir. 1998). In reviewing the record and the administrator's determination, however, the

15

Court will take into consideration the fact that a defendant is acting under a conflict of interest based on being both the decision-maker, who determines which claims are covered, and the payor of those claims. *Glenn*, 554 U.S. at 115–16; *Johnson v. Conn. Gen'l Life Ins. Co.*, 324 Fed. App'x 459, 465 (6th Cir. 2009). The weight that a conflict of interest receives is determined by case-specific factors. *Glenn* at 116–17 ("[C]onflicts are but one factor among many that a reviewing judge must take into account."); *Johnson* at 465–66.

## III.    DISCUSSION

Plaintiff Karen Connors argues that Defendant's denial of her application for long term disability benefits was arbitrary and capricious for the following reasons: the medical evidence establishes that she was disabled throughout the Elimination Period and LINA ignored Plaintiff's evidence and relied on Dr. Lipkin's flawed file review. Defendant asserts that its decision was not arbitrary and capricious because Plaintiff failed to demonstrate that she was disabled. The Court will discuss both parties' arguments in turn.

### A.    Whether Plaintiff was Disabled Throughout the Elimination Period

Defendant denied Plaintiff's application for Long-Term Disability benefits because she did not establish a continuous disability during the 120-day Elimination Period as required by the Plan. Specifically, Defendant references that the medical information provided does not support her claim that she was unable to perform her occupation beyond January 11, 2010. (AR 102-104).

Plaintiff does not dispute the evidence relied on by Defendant. She admits she attempted to go back to work, but asserts that although she saw some improvement, she was not able to resume her prior occupation. Plaintiff asserts that, contrary to Defendant's conclusions, the

evidence she provided demonstrates the nature and extent of her continuing disability, including conditions that were present during the Elimination Period.  She argues that solely relying on the medical records from the Elimination Period, specifically the records from January 10, 2010, does not provide the entire picture of her disability.

The Court agrees that Plaintiff's case is unique and her entire medical history is relevant, not just the records from the Elimination Period.  Plaintiff's treating physician clearly stated that Plaintiff continues to have difficulties working.  This was documented on October 20, 2011.  He opined that:

> At times, after a resection of a vestibular schwannoma, the brain lining continues to be irritated for some time afterwards. We have asked her to follow a diet to avoid triggers for migraine as well as a program of vestibular physical therapy.  I anticipate that these symptoms will improve over time but that they may take up to 3 years from the date of surgery to fully resolve.

(AR 220).

Defendant's reliance on Plaintiff's medical records from the Elimination Period do not reflect Plaintiff's entire medical condition.  In fact, Defendant relies on a medical record that stated Plaintiff was "doing well."  (*See* AR 103, 480).  Since Plaintiff was recovering from major brain surgery, "doing well" is a relative term that offers no evidence about whether she can work.  *See Elliott v. Metropolitan Life Ins. Co.*, 473 F.3d 613, 620 (6th Cir. 2006) ("'Getting better,' without more, does not equal 'able to work.'").  Further, the "doing well" comment was made by Dr. Niparko who stated that Plaintiff was "doing well 2 months after resection of her right vestibular schwannoma.  She has nearly full return of facial function."  (AR 481).  Therefore, in this context, the "doing well" seems to reference Plaintiff's facial nerves.

Defendant also focuses on Dr. Tamargo's January 11, 2010 note that asked Plaintiff "to

17

resume her social and professional activities without restrictions." (AR 377). However, Plaintiff again urges the Court to consider this comment in light of all the notes Dr. Tamargo made that day. Specifically, he noted that he expected Plaintiff's medical condition to continue to improve, "I anticipate that she will continue to improve and will notice progress from month to month, as opposed to week to week up to this point." (AR 377). At this point, Plaintiff had not fully recovered and it suggests she should not expect the improvement to occur quickly.

Plaintiff also makes an important point that there is no indication in the record that Dr. Tamargo even knew what Plaintiff's occupation was, or the level of activity that was required. The mere fact that he encouraged her to return to work does not establish that Plaintiff was able to perform all the essential functions of her own occupation.

In Dr. Tamargo's February 2011 follow-up with Plaintiff, he noted "I last saw the patient on 1/11/10. At that time, she stated that she was pleased with her progress but reported persistent dizziness, balance problems, and slight diplopia." (AR 422).

Dr. Lipkin, who conducted an independent review for Defendant, noted that "[i]f the claimant has periodic episodes of more severe balance disturbance, accommodation in the workplace may be needed to allow for breaks." (AR 517). Based on the aforementioned statements and Dr. Lipkin's opinion that "the physical stresses of administrative work would not be beyond [Connor's] capacities at this point" (AR 516), Defendant denied Plaintiff's application for long-term disability benefits. Plaintiff argues thatm although Dr. Lipkin noted that he reviewed the "Corporate Officer Job Description President/Chief Executive Officer, Grant/Riverside Methodist Hospitals Dated 4/1/1998," he failed to assess Plaintiff's limitations in light of the precise requirements of her job. Plaintiff asserts that Defendant's failure to do so

18

was arbitrary and capricious.

Plaintiff argues that she was disabled from performing the duties of her own occupation. Plaintiff was the President and CEO of Grant Hospital, a major metropolitan hospital.  Her job description included providing effective administrative management, consulting with the Board and senior management, directing strategic planning, and interfacing with the community and area academic institutions.  (AR 473-75).

Plaintiff is correct in arguing that when "the Plan language explicitly state[s] that a participant is disabled so long as 'he is unable to perform all the material and substantial duties of his occupation,'" the proper inquiry is whether the claimant could perform the duties the claimant's occupation actually entailed." *Kalish v. Liberty Mutual*, 419 F.3d 501, 506–07 (6th Cir. 2005); *Elliot*, 473 F.3d at 619 (noting that district court's reasoning was in error "because it relies on a general notion of 'sedentary' work rather than on the duties that [the claimant's] occupation entailed").

However, Defendant in the case at bar argues that it expressly considered the application of the medical evidence to Plaintiff's ability to work in her own position, which it summarized as follows:

> a review of the medical information fails to provide global or physical clinical findings indicative of a functional loss to preclude your client from performing the duties of her own occupation throughout her Elimination Period as defined above.  The medical records do not provide documentation, imaging, or examination to support that your client's symptoms would have severely impacted her ability to function in her own occupation as a President/Chief Executive Officer of Grant/Riverside Methodist Hospitals throughout her Elimination Period.

(AR 96).

The Court acknowledges that Defendant notes that it considered Plaintiff's own

19

occupation, however, there is no specific reference to Plaintiff's occupational duties or her ability or inability to perform them.  The Sixth Circuit in *Elliott* found that this cursory review without specific reference to Plaintiff's actual occupations duties could not be considered reasoned.  473 F.3d at 619.

Similarly in *Hunter v. Life Ins. Co. of North America*, 437 Fed. App'x 372, 376-77 (6th Cir. 2011), the Sixth Circuit held that it was irrational for the defendant insurance company to analyze whether the plaintiff could perform "sedentary work," as opposed to whether she could perform her actual job duties.  *Id.*  The Sixth Circuit held that plaintiff's actual job duties involved substantially more walking and standing than a "sedentary" job and, therefore, "because [defendant] did not assess the actual requirements of Hunter's prior occupation, specifically the walking, standing, and overtime requirement, its decision to terminate her LTD benefits was arbitrary and capricious."  *Id.*, citing *Elliott*, 473 F.3d at 618; *Evans v. Unum Provident Corp.*, 434 F.3d 866, 879-80 (6th Cir. 2006); *Kalish*, 419 F.3d at 506-507.

Defendant argues that the record lacks objective proof that Plaintiff was incapable of performing the duties of her own regular light duty position and thus, it did not act in an arbitrary and capricious manner in denying Plaintiff's claim for long term disability benefits.  Defendant noted in its final letter denying Plaintiff's appeal that "we have not been provided with medical documentation to support an impairment of functional capacity severe enough to affect her ability to work."  (AR 96).  The Court is concerned by the lack of evidence linking the medical evidence and Plaintiff's position that she cannot work.  The primary support for this contention comes from co-workers, but there is no medical evidence that places limitations on Plaintiff's ability to work.  Rather, Plaintiff is suffering from medical conditions that hinder her ability to

20

do her job.  The Court finds that the conditions that Plaintiff is suffering from have been continuous since her surgery.  This is not the case of her improving and then getting worse. Though the Plan specifically places the burden on Plaintiff to establish her disability, it is Defendant who was charged with evaluating Plaintiff's evidence of her disability and determining whether she could perform the specific tasks of her occupation.  For example, Plaintiff has presented evidence of her hearing loss, imbalance, dizziness, nauseau, fatigue, sensitivity to noise and visual stimuli, and double vision.  Defendant must then discuss Plaintiff's ability or inability to perform her occupational duties in light of these conditions.

The Court finds that Defendant's analysis was limited and not well-reasoned. Defendant's reliance on Plaintiff's treating physician's recommendation that she return to work was in error.  A doctor's statement that Plaintiff could return to work is not the equivalent of a conclusion that Plaintiff could complete the duties of her job.  Plaintiff should not be faulted for attempting to return to work because it is clear that after she returned, she was not able to perform at her previous level.  There is not dispute that Plaintiff experienced some improvement after the surgery, but the conditions Plaintiff referenced in her application for long-term disability benefits were not new, they were all a result of her brain surgery.  If Defendant finds that Plaintiff currently meets the definition of disabled under the Plan, then she was also disabled during the Elimination Period.  Therefore, the Court finds that this case should be remanded to Defendant to determine if Plaintiff is disabled under the Plan by considering the specific obligations of her occupation.

Accordingly, the Court finds that Defendant's determination was arbitrary and capricious "for want of a deliberate, principled reasoning process."  *Elliott*, 473 F.3d at 623 (citing *Glenn*,

21

461 F.3d at 666).  The Sixth Circuit has recognized that when a court finds issues with the decision-making process, then the "appropriate remedy generally is remand to the plan administrator."  *Elliot*, 473 F.3d at 622.  Accordingly, Plaintiff's claim shall be remanded to Defendant LINA for consideration of Plaintiff's entire medical record, not just the records from the Elimination period and consideration of Plaintiff's specific occupational requirements.[2]

**B.     Dr. Lipkin's Review**

Plaintiff argues that LINA's decision was arbitrary and capricious because it relied exclusively on Dr. Lipkin's flawed file review.  Specifically, Plaintiff asserts that Dr. Lipkin was not provided with copies of all of Plaintiff's submissions; Dr. Lipkin conceded that Plaintiff's vision problems were outside his expertise; Dr. Lipkin was selective in the medical records upon which he chose to rely; Dr. Lipkin did not address Plaintiff's limitation in light of the material duties of her job; and Dr. Lipkin made credibility determinations that are unreliable. (Plaintiff's Mot. at 13).

First, with respect to the review of all of Plaintiff's submissions, the Court agrees with Defendant that Dr. Lipkin's role was to review and assist in interpreting the medical evidence.  It was LINA's job to review all the evidence submitted by Plaintiff.  Second, the fact that Plaintiff's vision problems may be outside Dr. Lipkin's expertise is not a major concern because it was noted in Plaintiff's file and Dr. Lipkin's review was only a portion of the evidence considered by LINA.  It appears that LINA considered this evidence but still determined that, although Plaintiff's ophthalmologists diagnosed her as suffering from severe and substantial

---

[2]  Plaintiff argues that if the Court should find that Defendant's decision denying her long-term disability benefits was arbitrary and capricious, then the proper remedy is to award benefits.  However, the Court is not concluding that Plaintiff is necessarily entitled to benefits, but merely that Defendant's decision-making process should be more reasoned.

vision defects, they did not place restrictions on her ability to work.  Next, with respect to being selective in the review of the medical records, the Court has already found that LINA should consider all the records, including more recent documentation of Plaintiff's health, not just those from the Elimination Period.

Again, with respect to Plaintiff's argument that Dr. Lipkin did not assess Plaintiff's ability to function as a hospital president, the Court has already found that LINA's failure to do so was arbitrary and capricious.  Dr. Lipkin's review fails as well.  Again, he notes her occupation, but opines that "the physical stresses of administrative work would not be beyond [Connors's] capacities at this point."  (AR 516).  There is no question that Plaintiff's job was very demanding and not that of a typical administrator.

Finally, with respect to Plaintiff's claim that Dr. Lipkin's opinion is not reliable because he made credibility judgments without personally examining Plaintiff, Defendant argues that Plaintiff should be barred from making this argument.  Defendant asserts that equitable laches should be applied to bar Plaintiff from capitalizing on the lack of timely medical information she created and for applying for benefits more than fifteen months after her surgery.

There is no question that when an issue of credibility of a claimant's subjectively-reported symptoms arises, the Plan must follow reasonable procedures in deciding that issue.  The Sixth Circuit has held that "credibility determinations made without the benefit of a physical examination support a conclusion that the decision was arbitrary."  *Helfman v. GE Group Life Assurance Co.*, 573 F.3d 383, 395-96 (6th Cir. 2009); *see also Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 296-97 (conclusion that a claimant had subjectively exaggerated her symptoms was "incredible on [its] face" when physician reaching that conclusion never

23

examined the claimant).  There is no question that Defendant could have performed a medical examination, however, Defendant argues that its review was based solely on the evidence of Plaintiff's abilities during the 120-day elimination period from November 18, 2009 through March 18, 2010.  Therefore, based on that analysis, a physical examination performed after Plaintiff applied for disability benefits in 2001 would not have addressed whether she was capable of working a year earlier.  However, that reasoning was flawed.  Plaintiff has illustrated that she has continued to suffer from the effects of her surgery.  There is no question that she was attempting to return to her daily routine prior to the surgery, such as work and exercising.  However, she encountered difficulties in doing these things.  Therefore, Defendant could have requested Plaintiff submit to a physical examination to determine her current medical state and ultimately whether her current condition stems from her brain surgery.

## IV.    CONCLUSION

For the foregoing reasons, the Court **GRANTS** Plaintiff's Motion for Judgment on the Administrative Record  (Doc. 15) and **DENIES** Defendant's Motion for Judgment on the Administrative Record  (Doc. 14).

The Clerk shall remove Documents 14 and 15 from the Court's pending motions list.

The Clerk is instructed to close this case and remand it to the claims administrator Life Insurance Company of North America, to conduct a full and fair review of Plaintiff's claim for long term disability benefits consistent with this decision.

**IT IS SO ORDERED.**

 *s/ George C. Smith*                            
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**